UNITED STATES DISTRICT COURT   Dkt # 15-9357 (DLC) (HBP)

SOUTHERN DISTRICT OF NEW YORK  Amended for Dkt # & Judges Assigned

\-------------------------------------------------------

ERIC A. KLEIN,   Petitioner    PETITION FOR A WRIT

               OR CORAM NOBIS

      v.

UNITED STATES OF AMERICA,

        Respondent.

\-------------------------------------------------------

   Petitioner, by his attorney, HOWARD D. SIMMONS, ESQ., applies to this Court for a

Writ of Coram Nobis, pursuant to the All Writs Act, 28 U.S.C. §1651(a), and other sources of

law, and upon the following facts, exhibits hereto, and the records of this Court.

<u>Underlying Court Facts</u>

1. Petitioner was convicted in Dkt # 03 Cr. 813 (2) in July 2005 of three (3) fraud counts.

2. Petitioner pursued his direct appeal rights through 2009.

3. In 2009 Petitioner timely commenced a Pro Se § 2255 motion in this Court in Dkt

#09-cv-10048.

4. Presented within the § 2255 motion Petitioner Pro Se presented various claims some of

which went unanswered by the Prosecution (perhaps because Petitioner was untrained Pro Se);

and others of which may not have been incisively promulgated by Petitioner Pro Se sufficiently;

and still others might have been completely overlooked by the Court.

5. Petitioner's Pro Se § 2255 motion was denied on or around October 2012.

6. Applications have been made in the U.S. Court of Appeals for the Second Circuit as late

as August 2015 and denied in September 2015 for clarification(s) [of meanings of Orders].

7.     Very serious adverse consequences exist for both the Petitioner and the U.S. Judicial system if this application for a Writ of Coram Nobis is not granted.   Examples of such are:

a.     Petitioner was suspended/disbarred in the States of New York and New Jersey because of conviction;  Petitioner was not admitted to the Bar of the State of Florida because of conviction;

b.     Petitioner must with respect to the practice of law in, for example, New York, undertake lengthy, difficult, costly and uncertain disbarment/readmission process (which has begun);

c.     In such organizations that look to frauds, such as ACAMS, ACAMS has repeatedly not permitted Petitioner to train for ACAMS' Certification;

d.     Petitioner will, like with ACAMS, be prevented from pursuing activities where having a conviction for "fraud" can be an issue.

e.   Petitioner is former Deputy Clerk of a United States Court of Appeals, Second Circuit.  The conviction disqualifies him from returning to such activity and other Court activity.

8.   All the issues involved for the writ are fundamental constitutional and due process issues.

ISSUE I
To Compel Hearing as to Whether Petitioner as Defendant
Waived his Fundamental Constitutional Right to Counsel Post-Arraignment

9.   Summary of the law is clear:  that a felony defendant has the right to counsel at all times post-arraignment unless such fundamental right to counsel is waived by defendant.

10.    The record of the proceedings in 03 Cr. 813 show that defendant was Pro Se following the Arraignment.   See 12/1/04 Arraignment Transcript filed on the Docket already, showing that Defendant left the Arraignment proceedings as a Pro Se; and Letter from Prosecution thereafter dated 12/15/04 to Defendant as Pro Se post-arraignment concerning several case aspects, Ex. A.

2

11.   Accordingly based upon the Sixth Amendment to the Constitution and the process due thereupon to provide due process the Court needs to hold a Hearing to find out whether there was a waiver of the right to counsel post-arraignment.   See, Johnson v. Zerbst, 304 U.S. 458 (1938) (holding that there is a right to a plenary Hearing as to fact issue of defendant's waiver).

12.   To date no finding-of-fact whatsoever has been made as to whether or not defendant in fact waived the right to counsel post-arraignment.   See, e.g., U.S. v. Morgan, 346 U.S. 502 (1954) (holding that Writ of Coram Nobis procedure is a proper procedural device for issue of whether right to counsel was in fact waived by criminal felony defendant in federal district court.)

13.   It appears that defendant, then Pro Se, in his § 2255 motion claimed only generally that that there was a Sixth Amendment violation by the Court itself, but not specifically as to the distinct personal subjective question of whether defendant himself had waived the right to counsel.  Said question of whether defendant waived that right should thusly be addressed herein.

14.   Accordingly Petitioner requests a plenary Hearing pursuant to Johnson v. Zerbst, supra, to determine whether or not he waived the right to have counsel following the 12/1/14 arraignment. Pursuant to Johnson v. Zerbst, supra, the substantive right identified is that of the right to counsel post-arraignment subject to waiver; and the procedural right thereupon is for a plenary Hearing to determine whether or not there was a waiver by defendant of that substantive right to counsel.

ISSUE II
Due Process Violation
Failure to Disclose Brady/Giglio Material
Admissions of Brady/Giglio Violations in Prosecution's Answer

15.   Within the aforementioned § 2255 motion movant set forth that there were Brady/Giglio

3

non-disclosure violations denying him a fair trial pursuant to due process/the Fifth Amendment.

16.    Reference is to the papers filed in 09-civ-10048.  In same the Prosecution did not at all

in any way address the vast bulk of the claimed Brady/Giglio non-disclosures.    In fact the papers

show that the Prosecution only addressed two (2) such claims out of about 13 categories of

claims the Prosecution only addressed two (2) such claims out of about 13 categories of claims,

leaving about 11 such claims of Brady/Giglio claims fully admitted in the established record.

17.    A chart derived from the original pages of the papers filed, Ex. B hereto, highlights

precisely that the overwhelming amount of Brady/Giglio claims are fully admitted by the

Prosecution [as in such civil proceedings the failure to answer claims are absolute admissions].

Ex. B is page 26 of Defendant's Pro Se "Amended Petition" in 09-cv-10048 filed on January 30,

2012, and the circled items thereon are the Brady/Giglio claims admitted in the Prosecution's

Answer to the Amended Petition dated June 22, 2012 because they were not denied therein.

18.    Judge Jones clearly photocopied the Prosecution's response that addressed only two (2)

of about 13 categories of claims thereby effectively deleting the actual written claims made.

A copy of the relevant pages from the Prosecution's Answer dated June 22, 2012 (pages

numbered 38 & 39 which show the Prosecution only responded to a small minority of the

Brady/Giglio claims promulgated in Defendant's Pro Se "Amended Petition", Ex. C hereto).

19.    To recap, the admissions as to the Brady/Giglio violations from the Chart, Ex. B, are:

      1st of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court

The Purchase Order that Prosecution witness, Anderson, signed.  Same could have been

used both to impeach Anderson's testimony because the terms of his contract was not as he

4

testified, and also was exculpatory document because the transactions terms were legitimate.

<u>2nd of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

Not disclosed was documentation that Prosecution witness, Davis, lied about Capital One

not having a Secured CD program and also having no branches.  The documentation could have

been used to impeach and to show defendant had good faith belief that Capital One had such.

<u>3rd of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

Information that Deutsche Bank was a leader in the Secondary Market for Letters of

Credit.  This could have been used to impeach Prosecution witness, Baranello, who

testified there was no such Secondary Market, and exculpatory because there was

such a Market to sell any such that might be purchased in connection with Pan Global.

<u>4th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

That Prosecution witness Mercader was being paid to testify (and testify falsely).

<u>5th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

That Prosecution witness Holgate was also being paid to testify (and testify falsely).

Also his prior civil litigation history with respect to his former house property was not disclosed.

Same civil litigation history is set forth in <u>Holgate v. Baldwin,</u> 425 F. 3rd 671 (9th Cir. 2005).

The history recited therein would be both impeaching and exculpatory as used in the trial.

Whereas in fact Holgate had long before the subject transaction lost his house in

foreclosure he repeatedly testified falsely at trial that the subject transaction was for a simple

"mortgage loan".   It couldn't be for a "mortgage loan" as he had no such property to mortgage.

<u>Holgate v. Baldwin</u>, <u>id.</u>, also shows Holgate blamed his mortgage lenders for his

own failure to pay his mortgage, claiming that they were "racketeers" (which is essentially what he was calling defendant at trial).  Also not disclosed was not only that Holgate did not pay his mortgage loans, but that he also did not pay for several years his much smaller personal debt to Mr. Vance of about $20K and needed to testify falsely to get money to pay that.

Holgate's civil litigation also showed why the subject transaction mentioned at trial was fair, and not a fraud, and therefore also exculpatory.  Because Holgate did not pay his home mortgages and was foreclosed upon he needed to enter into a "lease-with-an-option to buy" transaction with tougher terms than for a mortgage loan, and then again on tougher terms because he had a demonstrable record of not paying back his loans and then suing his lenders. In short the withholding of information about Holgate was an seminal <u>Brady/Giglio</u> violation.

<u>6th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

This is the very tardy production of the Kostelanetz & Fink Memo that the Prosecution produced and used at the trial, Tr. Ex. 366.   Same Memo was exculpatory because it showed numerous witnesses available at Kostelanetz & Fink to buttress that defendant had a "good faith" belief that he was not involved in fraudulent transactions.  Yet the late production during the trial did not enable trial counsel to investigate and prepare those witnesses to testify.

<u>7th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

This was the April 2, 2003 Check that Probber used to pay his bail.  The check shows Probber manipulating the Court process because he committed multiple bank frauds to pay his bail.  This is exculpatory material because defense counsel's theory at the trial was that Probber was highly manipulative.  This fact could have used at trial to show Probber being manipulative.

6

<u>8th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

This was the records of defendant's Chapter 13 Bankruptcy.  The records showed

that defendant had about $1.5M in assets that pre-dated Probber's business; and could

have been used to rebut the Prosecution theory that defendant had *no assets* at the time

that Probber's business started and made $2M from Probber's business, when in fact the

amount that defendant made from Probber's business was closest to round figure of just $100K.

<u>9th of 9 Brady/Giglio Violations Admitted to and Unacknowledged by District Court</u>

This regards unique Prosecutorial approach of using the Lead Trial Prosecutor's very own

letter as direct prima facie evidence at trial.   It is contended that therefore he was a material

prospective witness and that his statements should have been disclosed for the defenses use.

ISSUE III
Due Process Violation
<u>Prosecution's Use in their Direct Case of Lead Trial Prosecutor's Very Own Letter</u>

20.    There is ancient prohibition against trial attorneys from also being witnesses, for which

the case law states is even more so and thus heightened with respect to trial prosecutors.

21.     In particular where the Prosecutor makes himself a witness to make the direct case it

can intimidate defense counsel from trying to defuse the direct case for multiple reasons, e.g.,

defense counsel might not want to attack the Prosecutor personally nor attack what is obviously

such a personal endeavor for the Prosecutor as reflected in violating such basic ethical precepts.

22.    Attached as Ex. D hereto is what was at the criminal trial the Prosecution's Exhibit # 100-

A, a letter dated December 21, 2000 ,which is authored by A.U.S.A. Streeter and copied to

defendant.  A.U.S.A. Streeter was the Lead Trial Prosecutor in 03-Cr-813(2).

7

23.    At trial the Prosecution's position was that since A.U.S.A. Streeter's letter stated that there was an investigation ongoing as to defendant's client's business operations that therefore the defendant knew that defendant was guilty (of what was being investigated).  A.U.S.A. Streeter's letter also contained as 'facts' inconsistencies with other evidence.

24.    Obviously this is controversial use within the adversarial process of A.U.S.A. Streeter's very own letter, Ex.  D hereto, Trial Ex. 100-A, which would [amongst other reasons] merit serious questioning at the trial of A.U.S.A. Streeter about his letter.

25.    However actual exegesis of A.U.S.A. Streeter's letter shows that it was written out of anger toward defendant because defendant did not voluntarily withdraw in the Keats case so that the obvious implication of A.U.S.A  Streeter's overall actions were that defense counsel who did not do as Streeter wished would wind up being indicted by him [which well explains why there is such a strong rule against trial Prosecutors being witnesses in their own cases].

26.    Therefore the use of this particular Lead Trial Prosecutor's letter at trial for the purposes of the Prosecution trying to make a direct case was not only wholly unethical, being in violation of Ethical Rules governing trial attorneys and prosecutors, but also a deprivation of due process [as defendant's trial defense counsel would not want to be indicted by the U.S. Government].

27.    Petitioner Pro Se brought up the fact that the Prosecution at trial used the Lead Trial Prosecutor's very own letter in his § 2255 motion but generally only in connection with his position that defense counsel was ineffective for not putting A.U.S.A. Streeter on the witness stand after the Prosecution placed A.U.S.A. Streeter's letter, Ex. D hereto, Trial Ex. 100-A, into direct evidence at trial.

28.    But a more full view of the particulars shows that the Prosecution's use of A.U.S.A.

Streeter's letter, Ex. D hereto, Trial Ex. 100-A, was, as above, a denial of due process because

A.U.S.A. Streeter was too personally involved at the trial as Lead Trial Counsel.  Specifically

Streeter's letter, Ex. D hereto, Trial Ex. 100-A, was both the center piece of the Prosecution's

case and the foundation of the Prosecution's un-American theories that permeated the entire

Prosecution case [to wit, that notice of a Streeter Investigation is equivalent to notice of Guilt of

whatever is being investigated].  See Ex. E hereto, Trial Trans. pages 17 & 27,  Streeter's words.

29.    Within the § 2255 motion proceeding the Prosecution did not address this issue at all

(just as it did not address the vast bulk of the Brady/Giglio non-disclosure violations denying

defendant a fair trial pursuant to due process/the Fifth Amendment) nor did Judge Jones.

ISSUE IV
Due Process Violation
New Brady/Giglio Failure to Disclose/Brought for First Time/"Lefall Claims"

30.    The  two (2) Judgments in 03 Cr. 813 (1) and (2) are peculiar in that the restitution

amounts for victim Karen Lefall are dramatically different.  In (1), which is Probber's Judgment,

Lefall is listed for $100K.  In (2), which is defendant's, she is listed for $177K in restitution.

31.    A recent investigation conducted on behalf of defendant indicates that Karen Lefall was,

during Probber's time of prison service in 03 Cr. 813, his Prison Pastor, while he was sentenced

to FCI/FMC in Fort Worth, Texas.  This fact should raise judicial hackles because it would mean

that if this an above board arrangement, this is something that would have needed judicial

consideration initially as in essence Probber had defrauded his soon to be Prison Pastor out of at

least $100K and yet was put into close and closed contact with her for several years, which could

be a dangerous situation for Probber (because he would still have owed her yet another $77K).

32.   The record indicates the discrepancy involves Probber defrauding the Court and defendant. The $100K figure corresponds with the amount of Probber's Bail.  It appears that  in 03-Cr. 813, despite the fact that he pled Guilty, that he created the Lefall claim so that he could rebate his $100K Bail amount, that he would otherwise be required to forfeit, to himself (to avoid his actually losing his $100K for victims).  See 11/10/15 Affidavit of Anthony Abraham, attached.

33.   Moreover it appears that since Probber was able to successfully manipulate the legal process on 03 Cr. 813(1) (he had prior experience with the federal criminal judicial process), and was emboldened thereby, he increased the Lefall claim from $100K for his Judgment to $177K for defendant's  --the $77K representing a profit gain for Probber, whereas, as above, the $100K in Probber's 03 Ci. 813 (1) case was just to prevent his taking a loss for that $100K amount.

34.   Clearly these manipulations by Probber are a gross distortion of the judicial system and frauds upon the Court.  See info re Lefall as Prison Pastor @ FCI/Ft. Worth, attached as Ex. F.

35.    The Prosecution should have been aware/was aware of Probber's concoction of the Lefall claim(s) prior to the time of Defendant's trial.   That they were at two different times at two different amounts ($100K vs. $177K) should have been a bright red flag to the Prosecution.

36.    Yet the Prosecution did not disclose to Defendant the Lefall claim pre-trial in either amount [perhaps out of embarrassment that Probber was able to manipulate it, even though they knew that Probber was essentially a "career criminal" entirely devoted to fooling everyone] .

37.    Same information about the Lefall claims is highly exculpatory and should have been disclosed to Defendant prior to trial.    The trial record shows that defendant's trial counsel

10

promulgated thereat a theory that Probber was highly manipulative, but lacked sufficient facts

to show the jury with respect to Probber's ability to manipulate to make that theory persuasive.

38.     The creation of the Lefall claim(s) by Probber was directly applicable to Probber's

ability to manipulate the criminal process, the Courts, and the Government, and hence doing

so to Defendant would have been dramatically demonstrable to the jury at trial.

39.     Therefore the Prosecution was absolutely pursuant to the Brady/Giglio doctrines required

to disclose to Defendant pre-trial Probber's creation of the Lefall Claim(s).   As above Probber's

creation of these Lefall claims, that were in the Prosecution's possession, pre-trial, were directly

exculpatory and would have been part and parcel of the Prosecution's essential disclosures to

defendant pre-trial to permit him to meaningfully defend and rebut the Prosecution's direct case.

## CONCLUSION: SUMMARY

30.     The Petition for a Writ is essentially made up of four (4) claims:

(1) to obtain a plenary Hearing pursuant to the instruction in Johnson v. Zerbst, 304 U.S. 458

(1938).   This seems to be the only methodology in which it can be found out whether defendant

waived or did not waiver the right to counsel post-arraignment (although it it clear that defendant

contends that he did not).   Nothing in the direct record shows that defendant waived the right to

counsel post-arraignment, but the Prosecution might be able to show in such plenary proceeding

that defendant in fact waived the right to counsel post-arraignment.   It is basic learning that the

right to counsel post-arraignment is a fundamental constitutional right, perhaps the single most

important such right.   Gideon v. Wainwright, 372 U.S. 335 (1963);   (2) to obtain an adjudication

upon the record that there were at least nine (9) Brady/Giglio violations.   The Brady/Giglio

11

doctrine is infused with basic Fifth Amendment due process concerns.  See Ex. B hereto

which shows all the fully admitted <u>Brady/Giglio</u> violations.   Same are in narrative on pages

4 to 6 hereinabove.   As above these are already fully admitted but for some reason were not

adjudicated as such previously ;  (3) involves the (hopefully) unusual situation when the Lead

Prosecutor uses his very own letter at the trial from another proceeding to try to make the

Prosecution's  direct case.  Clearly this practice should be frowned upon.  A.B.A. Model Rule 3.7

and <u>U.S. v.Pepe</u>, 247 F. 2d 838 (2nd Cir. 1957)(citing cases)(suggest another untarnished Pro-

secutor try case and active involvement by Judiciary to prevent contrary prosecutor practices);

(4)  the newly discovered <u>Brady/Giglio</u> violation with respect to the apparently phony Karen

Lefall restitution claims created by Probber to get himself money from the criminal process

although Probber himself pled Guilty in this Court to the fraud charges in 03 Cr. 813.  On its

face this appears to be an outrage by Probber against the entire criminal justice process, of

which Probber, as the Court records show, was a "veteran" of.   But that since Probber has

been able thus far to 'get away' with this outrageous manipulation of the criminal process

also informs as to how extremely louche the overall Prosecution herein was [as shown herein].

    The record in this case shows that the Prosecution only disclosed the prior convictions

of their three (3) witnesses during their trial testimony, not pre-trial, regardless of defendant's

trial counsel's ability to make use of those criminal convictions [and the trial record shows that

defendant's trial counsel was not able to make use of those prior convictions].   These three (3)

were: Pinnozoti, Mercader and Holgate.  The Prosecution has thus far very successfully argued

that its disclosure during their testimony was sufficient compliance with its <u>Brady/Giglio</u>

obligations.   While that seems a questionable practice as opposed to pre-trial disclosure it seems that the corollary is that other required <u>Brady/Giglio</u> disclosure obligations that have been admitted must be strictly enforced to so as to make up for those otherwise tardy disclosures.

One such was the phony Lefall claim created by Probber so that Probber could rebate his otherwise forfeited Bail to himself.  This was, as above, a key fact withheld by the Prosecution, so that Defendant could have proven at trial the dramatic extent that Probber successfully manipulates the most sophisticated judicial system, but he was deprived of that key information.

Previously for the 09-cv-10048 proceedings defendant was entirely Pro Se in the District Court.  While, of course, a Pro Se party, might not be able to get his/her points across to the Court well, the Court record can largely 'speak for itself'.   See 12/1/04 Arraignment Trans. and Ex. A showing defendant clearly to have been Pro Se in 03-cr.-813(2) post arraignment.   Therefore to conform to constitutional requirements regarding right to counsel post-arraignment the Court is required to have a finding of fact Hearing as to whether the defendant himself had waived the right to counsel post-arraignment.   Aside from same being required by the Constitution same is needed to find out the truth.   Simple "bookkeeping" shows numerous <u>Brady/Giglio</u> violations admitted in the record.   Numerous problems arise from the Lead Trial Prosecutor using his very own letter in the Prosecution's direct case.  The Court should be highly disturbed about the Lefall restitution claims being in hugely different amounts [being $100K in Probber's Judgment and $177K in Klein's] both in 03 Cr. 813.   Respectfully submitted,

_____/s/_____

Dated:  December 1, 2015                       HOWARD D. SIMMONS, ESQ.
                                                              Attorney for Petitioner, ERIC A. KLEIN
                                                                          225 Broadway, Suite 1700
                                                                          New York, N.Y. 10007
                                                                          212-219-3382                /13